## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| WAYNE H. BUTLER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 1:21cv782 |
| ) | |
| FORSYTH COUNTY SHERRIFF'S OFFICE, ) | |
| et al., ) | |
| ) | |
| Defendants. ) | |

### MEMORANDUM OPINION AND RECOMMENDATION
### OF UNITED STATES MAGISTRATE JUDGE

This case comes before the undersigned United States Magistrate Judge for a recommendation on Defendant Bobby Kimbrough's Motion for Summary Judgment (Docket Entry 19; see also Docket Entry 24 (Memorandum in Support)). Defendant Kimbrough also filed related sealing materials. (See Docket Entry 22; Docket Entry 23.) For the reasons that follow, the Court should grant the Motion for Summary Judgment and deny as moot the request for sealing.

### I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Pursuant to 42 U.S.C. § 1983 ("Section 1983"), Wayne Butler (the "Plaintiff"), a pretrial detainee acting pro se, commenced this action against several Defendants, including Defendant Kimbrough, for acts and/or omissions amounting to deliberate indifference to Plaintiff's serious medical needs during his detention at Forsyth County Law Enforcement Detention Center

("FCLEDC").  (See Docket Entry 2 (the "Complaint") at 1-30.)  As relevant here, Defendant Kimbrough, the Forsyth County Sheriff (id. at 3), allegedly failed to follow statewide mandates for face coverings as a result of the COVID-19 pandemic, in that he "made wearing a mask a mere option left up to the staff" (id. at 15) and, by designating masks as "contraband [for inmates]" (id at 16), Defendant Kimbrough "prevented [Plaintiff] from being able to have a mask in [his] possession" (id.).  In addition, Defendant Kimbrough's policies allegedly fell short in meeting social distancing mandates, in that "[Plaintiff] had over 6 cell mates and was housed in over 7 dorms" (id. at 15), and Plaintiff tested positive for COVID-19 on January 26, 2021, after "[he] was moved into a cell with another detainee who had COVID" (id.).

Pursuant to 28 U.S.C. § 1915A(a), the Court (per the undersigned) screened the Complaint to determine whether, inter alia, it "fails to state a claim upon which relief may be granted," 28 U.S.C. § 1915A(b)(1).  (See Docket Entry 3 (the "Recommendation") at 1.)  In connection with that review, the undersigned concluded that the allegations from the Complaint referenced above (i.e., those pertaining to alleged (1) mask directives and (2) social distancing practices) adequately stated a claim only against Defendant Kimbrough "based on deliberate indifference to Plaintiff's health during the pandemic."  (Id. at 4.)

Accordingly, the undersigned recommended that the Court dismiss all claims except those against Defendant Kimbrough. (See id. at 8.) The Court (per now-Chief United States District Judge Catherine C. Eagles) ultimately adopted the Recommendation, ordering "that [ P]laintiff's claims against [D]efendant Kimbrough may proceed but that the remainder of the claims in the Complaint are dismissed pursuant to 28 U.S.C. § 1915A for failing to state a claim upon which relief may be granted." (Docket Entry 10 at 2 (certain all-caps and bold typeset omitted).)

Thereafter, the Parties commenced discovery. (See Text Order dated Aug. 1, 2022 (adopting Scheduling Order).) After discovery closed, Defendant Kimbrough moved for summary judgment. (See Docket Entry 19; see also Docket Entry 20 (First Affidavit); Docket Entry 21 (Second Affidavit); Docket Entry 24 (Memorandum in Support).) On May 1, 2023, the Clerk sent Plaintiff a letter advising him of his "right to file a 20-page response in opposition . . . within 30 days from the date of service of [Defendant Kimbrough's Motion for Summary Judgment] upon [him]." (Docket Entry 25 at 1.) The letter specifically cautioned Plaintiff that a "failure to respond or . . . file affidavits or evidence in rebuttal within the allowed time may cause the [C]ourt to conclude that [Defendant Kimbrough's] contentions are undisputed and/or that [Plaintiff] no longer wish[es] to pursue the matter," as well as that, "unless [Plaintiff] file[s] a response in opposition to the

3

[Summary Judgment Motion], it is likely . . . summary judgment [will be] granted in favor of [Kimbrough]." (Id.)

Plaintiff thereafter filed a Notice with the Court wherein he indicated that "[he] only received [Defendant Kimbrough's] notice of intent [to file dispositive motions (Docket Entry 18)] . . . [but] ha[d] not received the actual Motion for Summary Judgement [in order] to file [his] Response in opposition." (Docket Entry 26 at 1.) As a result, the Court (per the undersigned) ordered that Defendant Kimbrough "re-serve Plaintiff with [the] Motion for Summary Judgment (and attachments), [the First] Affidavit (and attachments), [the Second] Affidavit (and attachments), [the sealing materials], and [the] Memorandum [in Support]." (Text Order dated May 30, 2023.) Two days later, counsel for Defendant Kimbrough certified that "he did re-serve Plaintiff . . . by depositing [the filings referenced in the May 30 Text Order] in the United States Postal Service mail in an envelope labeled 'legal mail' and addressed to [Plaintiff]." (Docket Entry 27 at 1.) Then, on June 13, 2023, the Clerk sent Plaintiff a second letter advising him of his right to respond, which included the same cautions as the May 1 letter. (See Docket Entry 28 at 1 (including same language as Docket Entry 25).)

Despite these warnings, Plaintiff did not respond. (See Docket Entries dated June 13, 2023, to present.) Given that lack of response and the fact that Plaintiff did not verify the factual

4

allegations in the Complaint (see Docket Entry 2 at 38 (certification that "the factual allegations have evidentiary support" for purposes of Federal Rule of Civil Procedure 11)), Plaintiff's bare allegations cannot controvert facts which the Summary Judgment Motion or record establish. See Custer v. Pan Am. Life Ins. Co., 12 F.3d 410, 416 (4th Cir. 1993) (recognizing that party's failure "to respond to a summary judgment motion may leave uncontroverted those facts established by the motion").[1] For the reasons that follow, no genuine issue of material fact remains and the Court should grant the Motion for Summary Judgment.

## II. DISCUSSION

### A. Summary Judgment Standards

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S.

---

1 By local rule, "[i]f a respondent fails to file a response within the time required . . ., the motion will be considered and decided as an uncontested motion, and ordinarily will be granted without further notice." M.D.N.C. LR 7.3(k). However, the Fourth Circuit requires substantive review of even unopposed motions for summary judgment. See Custer, 12 F.3d at 416 ("[T]he court, in considering a motion for summary judgment, must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law.").

242, 248 (1986). The movant bears the burden of establishing the absence of such dispute. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In analyzing a summary judgment motion, the Court "draw[s] all reasonable inferences in favor of the non-moving party. Emmons v. City of Chesapeake, 982 F.3d 245, 250 (4th Cir. 2020). However, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987)). Rather, the Court must "find that a reasonable jury could return a verdict for [the nonmoving party in order for] a genuine factual dispute [to] exist[] . . . ." Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996).

## B. Deliberate Indifference

Turning to the constitutional deprivation alleged here,

> when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs — e.g., food, clothing, shelter, medical care, and reasonable safety — it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 200 (1989) (emphasis added). Courts evaluate pretrial detainees' conditions of confinement in state custody under the Due Process Clause of the Fourteenth Amendment. See Bell v. Wolfish, 441 U.S. 520, 535 (1979). "The due process rights of a pretrial detainee are at least as great as the [E]ighth [A]mendment protections

6

available to the convicted prisoner." Martin v. Gentile, 849 F.2d 863, 870 (4th Cir. 1988).

In other words, "even though [a pretrial detainee's deliberate-indifference] claim arises under the Fourteenth Amendment, [courts] have traditionally looked to Eighth Amendment precedents in considering a Fourteenth Amendment claim of deliberate indifference . . . ." Mays v. Sprinkle, 992 F.3d 295, 300 (4th Cir. 2021). The Eighth Amendment requires that prison officials "provide humane conditions of confinement," Farmer v. Brennan, 511 U.S. 825, 832 (1994), which includes, among other things, "reasonable measures to guarantee the safety of the inmates," id. For constitutional claims in this context, a defendant displays deliberate indifference when he possesses knowledge of the risk of harm to an inmate and knows that "his actions were insufficient to mitigate the risk of harm to the inmate arising from his medical needs." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008) (emphasis and internal quotation marks omitted); see also Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016) ("To prove deliberate indifference, plaintiffs must show that 'the official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety.'" (brackets in original) (quoting Farmer, 511 U.S. at 837)).

Of particular importance, "deliberate indifference entails something more than mere negligence, . . . [but] something less

7

than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer, 511 U.S. at 835. "It requires that a [defendant] actually know of and disregard an objectively serious condition, medical need, or risk of harm." De'lonta v. Johnson, 708 F.3d 520, 525 (4th Cir. 2013) (internal quotation marks omitted); see also Iko, 535 F.3d at 241 (emphasizing that deliberate indifference's "subjective component . . . sets a particularly high bar to recovery").

### C. Liability Under Section 1983

"A state official can be liable in a § 1983 suit in three ways: in his personal capacity, his official capacity, or in a more limited way, his supervisory capacity." King v. Rubenstein, 825 F.3d 206, 223 (4th Cir. 2016). As to personal liability, the plaintiff must "show that the official, acting under color of state law, caused the deprivation of a federal right." Kentucky v. Graham, 473 U.S. 159, 166 (1985). "As a general matter, a [state actor] may incur [Section] 1983 liability only through affirmative misconduct." Randall v. Prince George's Cnty., 302 F.3d 188, 202 (4th Cir. 2002) (quoting Parratt v. Taylor, 451 U.S. 527, 535–36 (1981)). "[Section] 1983 must be 'read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'" Vinnedge v. Gibbs, 550 F.2d 926, 928 (4th Cir. 1977) (quoting Monroe v. Pape, 365 U.S. 167, 187 (1961)). Accordingly, "it must be 'affirmatively shown that the

8

official charged acted personally in the deprivation of the plaintiff's rights.'" Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985) (quoting Vinnedge, 550 F.2d at 928).

"Official-capacity suits, in contrast, generally represent only another way of pleading an action against an entity of which an officer is an agent." Graham, 473 U.S. at 165 (internal quotation marks omitted). "To state a[n official-capacity] cause of action . . . a [S]ection 1983 plaintiff must plead (1) the existence of an official policy or custom; (2) that the policy or custom is fairly attributable to the municipality; and (3) that the policy or custom proximately caused the deprivation of a constitutional right." Pettiford v. City of Greensboro, 556 F. Supp. 2d 512, 530 (M.D.N.C. 2008).

As for supervisory liability, under Fourth Circuit authority,

> a supervisor can be liable [under Section 1983] where (1) he knew that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury; (2) his response showed deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) [] there was an affirmative causal link between his inaction and the constitutional injury.

King, 825 F.3d at 224 (internal quotation marks omitted). For the first element, "[e]stablishing a pervasive and unreasonable risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir.

9

1994) (internal quotation marks omitted). Relatedly, a plaintiff ordinarily cannot satisfy the second element "by pointing to a single incident or isolated incidents, for a supervisor cannot be expected to promulgate rules and procedures covering every conceivable occurrence within the area of his responsibilities." Slakan v. Porter, 737 F.2d 368, 373 (4th Cir. 1984) (internal citation omitted). However, "[a] supervisor's continued inaction in the face of documented widespread abuses . . . provides an independent basis for finding he either was deliberately indifferent or acquiesced in the constitutionally offensive conduct of his subordinates." Id. And as for the third element, proof of causation "may be direct . . . where the policy commands the injury of which the plaintiff complains[,] [o]r the causal link may be supplied by tort principle that holds a person liable for the natural consequences of his actions." Wellington v. Daniels, 717 F.2d 932, 936 (4th Cir. 1983).

### D. Defendant Kimbrough's Summary Judgment Motion

Defendant Kimbrough has sought summary judgment on the grounds that he responded reasonably (and thus necessarily without deliberate indifference) to the risks posed by the COVID-19 pandemic. (See generally Docket Entry 24 at 11-20 (highlighting how the FCLEDC implemented CDC Guidance with respect to sanitation and education, operations, screening procedures, quarantining and social distancing, personal protective equipment, and testing).)

10

Alternatively, Defendant Kimbrough has contended that, if constitutional violations occurred, qualified immunity shields him from liability. (See id. at 20-22 (citing Ross v. Russell, No. 7:20cv000774, 2022 WL 767093 (W.D. Va. Mar. 14, 2022) (unpublished).) As already noted, Plaintiff did not respond to Defendant Kimbrough's arguments. (See Docket Entries dated June 13, 2023, to present.)

### E. Analysis

*Masking Directives*

Defendant Kimbrough moves for summary judgment as to Plaintiff's allegations concerning masking directives at the FCLEDC. (See Docket Entry 24 at 18.) As noted, the Complaint contends that Defendant Kimbrough "made wearing a mask a mere option left up to the staff" (Docket Entry 2 at 15) and, by designating masks as "contraband [for inmates]" (id at 16), "prevented [Plaintiff] from being able to have a mask in [his] possession" (id.). The record refutes both these allegations.

In that regard, the record reflects that Plaintiff entered the FCLEDC on May 4, 2020. (Docket Entry 20 at 2.) Prior to Plaintiff's arrival, the record indicates that the FCLEDC instituted several measures to respond to COVID-19, including "designat[ing] areas within the facility to house inmates suspected of having COVID-19" (id. at 3), "screening jail staff, [] medical staff [], custodians, or any other contractors who entered the

11

facility [for elevated temperatures or symptoms of respiratory illness]" (id.; see also Docket Entry 20-7 at 1), suspending "public visitation . . . with the exception of attorney visits" (Docket Entry 20-7 at 1), and screening new intakes for elevated temperatures or "signs of respiratory illness" (Docket Entry 20 at 3; see also Docket Entry 20-8 at 2).

Most relevant to the masking allegations, by April 28, 2020, the FCLEDC "required jail staff, inmate workers, medical staff and any contract workers to wear N95 masks if they were assigned to a new intake housing unit . . . [and] required all jail staff, medical staff, inmate workers, and contractors to wear surgical masks throughout the entire facility when interacting with inmates." (Docket Entry 20 at 5; see also Docket Entry 20-15; Docket Entry 20-16.) FCLEDC officials repeatedly communicated these directives to jail staff. (See Docket Entry 20-27 at 1 ("officers need[] to wear masks"); Docket Entry 20-28 at 1 ("[a]ll staff[] are required to wear a mask . . . [i]t is mandatory that masks are worn at all times"); Docket Entry 20-29 at 1 ("[p]lease make sure everyone is wearing your masks . . . we [are] required to wear them").) Moreover, starting in December 2020, the FCLEDC required staff to wear masks at all times "while inside the facility, and not just [when the staff interacted with] others." (Docket Entry 20 at 8; see also Docket Entry 20-30 (memorandum dated December 3, 2020 setting forth aforementioned policy).)

12

Accordingly, the record undermines the Complaint's contention that Defendant Kimbrough "made wearing a mask a mere option." (Docket Entry 2 at 15.) On the contrary, by the time Plaintiff arrived at the FCLEDC, staff had received a directive to wear masks whenever interacting with inmates (see Docket Entry 20 at 5), and, by December 2020, had to wear masks at all times, even when not interacting with inmates (see id. at 8). Plaintiff's "[u]nsupported speculation" to the contrary does not suffice at the summary judgment stage. Felty, 818 F.2d at 1128.

As for the Complaint's other mask-related allegation, the record similarly discredits the notion that Defendant Kimbrough either designated masks as "contraband [for inmates]" (Docket Entry 2 at 16), or took any measure to "prevent[ Plaintiff] from being able to have a mask in [his] possession" (id.). On that front, the record reflects (as an initial matter) that at least some inmates (inmate workers) received masks prior to Plaintiff's arrival at the FCLEDC, and had to wear them whenever at work. (See Docket Entry 20 at 5; Docket Entry 20-15 at 1.) The record further shows that, after certain staff (but no inmates) tested positive for COVID-19 on June 12, 2020 (approximately one month after Plaintiff's arrival), the FCLEDC provided surgical masks to all inmates, and instructed them to wear masks for the following fourteen days. (See Docket Entry 20 at 6; Docket Entry 20-20 at 1.) Then, the FCLEDC, beginning in October 2020, instituted a policy of providing

13

masks to all new inmates.  (See Docket Entry 20-31.)  Following that, beginning on December 8, 2020, the FCLEDC **required** inmates to wear masks any time they left their cells.  (See Docket Entry 20 at 7; see also Docket Entry 20-39.)  The FCLEDC reiterated this policy on January 8, 2021, and further provided that inmates could exchange used surgical masks for new ones at a rate of two per day. (See Docket Entry 20-40.)

In sum, the available record evidence disproves the Complaint's contention that Defendant Kimbrough ever designated masks as contraband or sought to prevent Plaintiff from possessing and/or wearing one.  (See Docket Entry 2 at 16.)  Rather, the record establishes that the FCLEDC provided masks to inmate workers beginning in April 2020 (see Docket Entry 20 at 5; Docket Entry 20-15), all inmates in June 2020 (perhaps only temporarily as a responsive measure to a rise in COVID-19 cases among staff) (see Docket Entry 20 at 6; Docket Entry 20-20 at 1), all new inmates starting in October 2020 (see Docket Entry 20-31), and all inmates in December 2020 (along with the requirement that the inmates wear those masks) (see Docket Entry 20-39).  Although the FCLEDC stepped up its masking policy from April until December 2020, no record evidence suggests that Defendant Kimbrough ever prevented Plaintiff from procuring a mask; in fact, the record indicates that Plaintiff never submitted an inmate request for a mask.  (See Docket Entry 20 at 11.)  Plaintiff's unverified allegations to the contrary do not

14

suffice for purposes of summary judgment. See Custer, 12 F.3d at 416. Thus, under the circumstances, the Court should conclude that no reasonable fact-finder could attribute deliberate indifference to Defendant Kimbrough in his personal, official, or supervisory capacities as to the mask-aspect of any deliberate indifference claim.

*Social Distancing*

The Memorandum in Support also targets the Complaint's allegations concerning social distancing. (See Docket Entry 24 at 13-16.) As noted, the Complaint's allegations on that topic include that "[Plaintiff] had over 6 cell mates and was housed in over 7 dorms" (Docket Entry 2 at 15), and that Plaintiff tested positive for COVID-19 on January 26, 2021, after "[he] was moved into a cell with another detainee who had COVID" (id.). The record again refutes the latter allegation, and, the former allegation (standing alone) cannot as a matter of law support a claim for deliberate indifference.

First, the record reflects that Plaintiff did test positive for COVID-19 on January 26, 2021. (See Docket Entry 20 at 10.) However, this positive test did not follow his placement "into a cell with another detainee who had COVID" (Docket Entry 2 at 15). Rather, the record shows that, from September 15, 2020 to January 11, 2021, the FCLEDC housed Plaintiff in the same cell, and he did not share that cell with another inmate. (See Docket Entry 20-55

15

at 1.)  Then, on January 11, 2021, Plaintiff moved into a different cell, but he again had the cell to himself.  (See id. at 2.)  The next day, January 12, Plaintiff moved into another cell and, although another inmate moved into that cell on the same day, the record shows that Plaintiff only stayed in this cell for approximately three hours, and moved out before the other inmate moved in.  (See id. at 3.)  Next, Plaintiff moved into a different cell on the evening of January 12.  (See id. at 4.)  Another inmate had previously resided in this cell, but the record again shows that the inmate moved out prior to the time at which Plaintiff moved in.  (See id.)  Plaintiff thereafter stayed in that cell by himself for the two weeks preceding his positive test for COVID-19.  (See id. at 5.)

Accordingly, the record establishes that Plaintiff never moved "into a cell with another detainee who had COVID [prior to Plaintiff testing positive]."  (Docket Entry 2 at 15.)  In fact, Plaintiff did not share a cell with anyone for (at least) four months prior to January 26, 2021.  (See generally Docket Entry 20-55.)  Although, on January 12, he moved out of and into a cell on the same day that other inmates also resided in that cell, the record shows that his time never overlapped with another inmate in either cell.  (See id. at 3-4.)  Moreover, Plaintiff subsequently remained in the second cell, without a cell mate, for two weeks prior to his positive COVID-19 test.  (See id. at 4.)  Thus, the

16

Court should determine that no reasonable factfinder could conclude that a policy of Defendant Kimbrough's caused Plaintiff to move into a cell with another detainee who had COVID." (Docket Entry 2 at 15.)[2]

The foregoing record evidence undermines three of the four allegations from the Complaint, leaving only Plaintiff's assertion that "[he] had over 6 cell mates and was housed in over 7 dorms which clearly deprived [him] of the reasonable chance to exercise social distancing." (Id.) That allegation, by itself, does not suffice to support a claim for deliberate indifference as a matter of law.

First, to put that statement in context: Plaintiff resided at the FCLEDC for approximately 17 months prior to filing the Complaint. (Compare Docket Entry 20 at 2 (documenting Plaintiff's

---

2 Given this recommended disposition, the Court need not examine certain inmate medical records which Defendant Kimbrough submitted under seal along with the Motion to Seal. (See Docket Entry 22; Docket Entry 23.) To that point, the cell transfer logs (Docket Entry 20-55) adequately demonstrate that Plaintiff did not move into a cell with another inmate prior to his positive COVID-19 test. Thus, because the Court does not have to review the medical records in order to resolve this aspect of the Motion for Summary Judgment, "'they play [no] role in the adjudicative process," Stafford v. Stout, No. 1:20-CV-731, 2023 WL 3006102, at *10 (M.D.N.C. Apr. 19, 2023) (citing In re Application of U.S. for an Ord. Pursuant to 18 U.S.C. Section 2703(d), 707 F.3d 283, 290 (4th Cir. 2013)), recommendation adopted, No. 1:20-CV-731, 2023 WL 4707182 (M.D.N.C. July 24, 2023). Consequently, "[r]ather than wade into thorny issues of patient privacy, the Court should instead conclude that the public right of access does not attach to these non-adjudicative documents, deny the Motion to Seal as moot, and direct the Clerk to remove Plaintiff's medical records (in unredacted format at Docket Entry [23]) from the Docket." Id.

17

arrival on May 4, 2020), with Docket Entry 2 at 1 (bearing filing date of October 8, 2021).) In addition, Plaintiff does not allege that he ever resided with more than one cell mate at the same time (see id. at 15), and the record does not reflect any periods with multiple cell mates (see Docket Entry 20-55 (documenting four-month period where Plaintiff had no cell mate)). As such, Plaintiff effectively maintains that the impossibility of social distancing in a jail setting evinces deliberate indifference on the part of Defendant Kimbrough.

"However, the inability of detainees to practice social distancing at all times does not, without more, demonstrate that [jail officials] have deliberately disregarded the[] risks [of COVID-19]." Duvall v. Hogan, No. 94-CV-2541, 2020 WL 3402301, at *14 (D. Md. June 19, 2020). To repeat, the subjective element of a deliberate indifference claim "sets a particularly high bar to recovery." Iko, 535 F.3d at 241. In light of that high bar, "[f]ailing to do the impossible doesn't evince indifference, let alone deliberate indifference." Swain v. Junior, 961 F.3d 1276, 1287 (11th Cir. 2020) (vacating district court injunction that rested in part on conclusion that jail's "inability to ensure adequate social distancing constituted deliberate indifference" (internal quotation marks omitted)).

Because "[s]pace constraints [in jail settings] do not allow for the more preferable degree of social distancing that exists in

18

the community at large," Mays v. Dart, 453 F. Supp. 3d 1074, 1095 (N.D. Ill. 2020), "there is no basis in the record to conclude that planning for anything less than six-foot distancing between all prisoners (and staff) at all times constitutes deliberate indifference," Plata v. Newsom, 445 F. Supp. 3d 557, 565 (N.D. Cal. 2020). At bottom, "[i]n this case, the undisputed summary judgment record establishes that [Defendant Kimbrough reasonably] responded to the COVID-19 pandemic by putting in place measures designed to control the spread of COVID-19 in the [FCLEDC]." Horton v. Holloway, No. 5:20-CV-05138, 2021 WL 7185222, at *13 (W.D. Ark. Dec. 1, 2021) (unpublished), recommendation adopted, No. 5:20-CV-5138, 2022 WL 118418 (W.D. Ark. Jan. 12, 2022) (unpublished). Plaintiff, in failing to respond, has adduced no material evidence to the contrary. See Custer, 12 F.3d at 416. As a result, the Court should conclude that no reasonable fact-finder could attribute deliberate indifference to Defendant Kimbrough in his personal, official, or supervisory capacities as to the social distancing-aspect of any deliberate indifference claim.[3]

---

3 Given that proposed resolution, the Court need not reach qualified immunity as an alternative basis for granting judgment for Defendant Kimbrough. See Brooks v. Johnson, 924 F.3d 104, 119 n.6 (4th Cir. 2019) ("recogniz[ing] the 'special problem' raised when the objective qualified immunity standard is applied to an Eighth Amendment violation that requires wrongful intent in the form of 'deliberate indifference'" (quoting Rish v. Johnson, 131 F.3d 1092, 1098 n.6 (4th Cir. 1997))).

19

## CONCLUSION

Because the record lacks evidence from which a reasonable fact-finder could conclude that Defendant Kimbrough exhibited deliberate indifference to Plaintiff's serious medical needs or risk of harm, Defendant Kimbrough has established entitlement to judgment as a matter of law.

**IT IS THEREFORE RECOMMENDED** that the Summary Judgment Motion (Docket Entry 19) be granted, the Motion to Seal (Docket Entry 22) be denied as moot, and that the medical records (Docket Entry 23) be stricken.

This 11th day of August, 2023.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**